Tagged Opinion



**ORDERED in the Southern District of Florida on September 30, 2009.**

John K. Olson, Judge
United States Bankruptcy Court

_____

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Fort Lauderdale Division**
www.flsb.uscourts.gov

In re:

**New River Boat Club, Inc.**,

           Debtor

_____/

Case No: 07-11531-JKO

Chapter 7

**ORDER DENYING TRANSWORLD MARINE CO.'S**
**MOTION FOR SANCTIONS AGAINST AUCTIONEER [DE 561]**

      Transworld Marine Co., a bidder at a failed auction, seeks sanctions against the auctioneer

for what it contends was improper conduct at the auction [DE 561]. The Chapter 7 Trustee joined

in the motion [DE 623]. I conducted a trial on February 19, 2009 pursuant to an Order Specially

Setting Bifurcated Evidentiary Hearing [DE 625] and, because I conclude that the failure of the

auction was not the result of misconduct or breach of duty by the auctioneer, I will deny the motion

for sanctions.

**Background**

New River Boat Club, Inc. filed its voluntary Chapter 11 Petition on March 7, 2007 [DE 1]. It operated a full service marina near downtown Fort Lauderdale on the New River. After unsuccessfully attempting to confirm a plan of liquidation, which included the sale of substantially all of its assets under Chapter 11, the case was converted to Chapter 7 on October 7, 2008 [DE 593].

While the case was still in Chapter 11, New River Boat Club (the "Debtor") sought authorization to conduct an auction of its marina facility [DE 376] (the "Sale Motion"). The Creditors' Committee joined in the Sale Motion, in which the Debtor pointed to "extensive discussions with a number of parties" who might act as "stalking horse" bidders. *See* [DE 376, at ¶ 12].

The Sale Motion memorialized the following stipulation with the Debtor's largest creditor, 84 Marina, LLC:

> Pursuant to a stipulation by and among the Debtor, 84 Marina, and the Committee, set forth on the record before the Court on April 17, 2008 (the "Sale Stipulation"), the Parties have agreed, *inter alia*, to a schedule for the auction sale of the Debtor's Real Estate. The Parties further agreed to work in good faith to determine the amount of 84 Marina's allowed secured claim.[3] In connection with that claim and for purposes of this Motion, the Committee and the Debtor concede that as of June 30, 2008, the amount of 84 Marina's allowed secured claim is at least $12,750,000. Notwithstanding, the Parties agree that 84 Marina may "credit bid" pursuant to section 363(k) of the Bankruptcy Code up to the amount of $12,900,000, without the requirement of a cash deposit, in connection with the sale of the Real Estate.

[DE 376, at ¶ 8].

The Sale Motion set out detailed and complex bidding procedures which I adopted on May 13, 2008 [DE 391] (the "Sale Order"). The Sale Order set a sale confirmation hearing

(the "Sale Hearing") and approved modified sale procedures including the following relevant provisions:

3.  <u>Qualification to Bid</u>. Any interested party (a "Bidder") may submit to the Debtor at the Offices of Berger Singerman, P.A., 350 East Las Olas Boulevard, Suite 1000, Fort Lauderdale, FL 33301 (Attn: Arthur J. Spector, Esq.), with a copy to Bilzin Sumberg Baena Price & Axelrod LLP, 200 South Biscayne Boulevard, Suite 2500, Miami, FL 33131 (Attn: Mindy A. Mora, Esq.), so as to be received not later than 5:00 p.m. (Eastern Time) on June 25, 2008 (the "Sealed Bid Deadline"), the following to constitute a Qualifying Bid (a "Qualifying Bid"):

(a)  *Purchase and Sale Agreement*. A purchase and sale agreement (the "PSA") for the Real Estate, executed by such Bidder, subject to the following additional requirements:

(i) the PSA shall be substantially in the form attached hereto as Exhibit "A;" provided, however, if the PSA being submitted differs in any respect from such exhibit, the Bidder shall also provide a redlined version identifying such differences;

(ii) in no event shall the PSA be contingent upon: (i) financing; (ii) the completion of unperformed due diligence; or (iii) the obtaining of approvals from the Bidder's board of directors or other internal approvals or consents;

(iii) the PSA or an exhibit thereto shall designate the executory contracts and unexpired leases which the Bidder requests the Debtor to assume and assign to the Bidder (the "Assumed Agreements");

(iv) if there is a Stalking Horse Bid, the amount bid for the Real Estate (the "Purchase Price"), in the aggregate, must exceed an amount equal to the sum of the Stalking Horse Bid, plus the break-up fee due to the Stalking Horse Bidder, if any, plus $100,000 (the "Minimum Overbid"); if there is not a Stalking Horse Bid, there will not be a Minimum Overbid;

(v) the PSA shall be subject to approval by the Bankruptcy Court and to higher and better offers; and (vi) the PSA shall provide for a closing (the "Closing") not later than 15 days after the entry of the Sale Approval Order (as hereinafter defined).

(vi) the PSA shall provide for a closing (the "Closing") of not later than 15 days after the entry of the Sale Approval Order (as hereinafter defined), but not later than July 31, 2008.

3

(b) *Deposit*. The Bidder must remit a cashiers' or certified check payable to the order of the Berger Singerman P.A. Trust Account for the benefit of the Debtor, in immediately available funds aggregating $250,000 (the "Deposit").

(c) *Financial Ability*. The Bidder must be financially able to consummate the purchase of the Real Estate and shall provide:

> (a) evidence satisfactory to the Debtor and the Committee, in their discretion, that the Bidder is financially capable of unconditionally performing all obligations under the PSA; or

> (b) a firm commitment from a financial institution, which the Debtor and the Committee deem satisfactory in their discretion, to provide financing for the purchase of the Real Estate, and containing no contingencies other than the bid being deemed the Final Successful Bid (as defined below).

(d) *Bid Irrevocable*. Bids must be irrevocable and shall remain open until the conclusion of the Sale Hearing (as defined below).

* * *

4.  <u>Highest and/or Best Bid</u>. After the Sealed Bid Deadline has passed, the Debtor, in consultation with the Committee, shall together determine which bids constitute Qualifying Bid(s), if any, and which Qualifying Bid constitutes the highest or otherwise best offer (the "Preliminary Successful Bid"). Following the selection of the Preliminary Successful Bid, on the day of the auction, the Debtor shall conduct an "open outcry" auction (an "Auction") for the Real Estate.

5.  <u>Auction</u>. The Auction will be conducted in accordance with procedures that the Debtor and the Committee, after consultation and agreement, determine will achieve the maximum realizable value for the Real Estate. The procedures shall be announced at the commencement of the Auction. The Debtor, with the consent of the Committee, may terminate the Auction at any time and for any reason.

* * *

(c) *Bidding, Minimum Increments, etc*. Bidding shall commence at the amount and on the terms specified in the Preliminary Successful Bid for the Real Estate, which shall be announced by the Debtor at the commencement of the Auction. Bidders may submit successive bids in increments of $100,000 or greater than the prior bid for the purchase of the Real Estate. Bidding shall continue until there is only one bid for the Real Estate that the Debtor and the Committee, have determined to be the highest or best offer for the Real Estate (the "Final Successful Bid").

(d) *Successful Bidder(s)*. At the conclusion of the Auction, the Debtor shall announce the Final Successful Bid, and shall announce a first back-up bid ("First Back-Up

Bid") and second back up bid (a "Second Back-Up Bid" together with the First Back-Up Bid, the "Back-Up Bids"), for the Bidders that the Debtor and the Committee, have determined to be the second and third highest or best offer(s) for the Real Estate. At the Sale Hearing, the Debtor shall present the Final Successful Bid and Back-Up Bids to the Bankruptcy Court for approval.

(e) *Reservation of Rights*. The Debtor shall have the right in its discretion, with the consent of the Committee, to: (i) request of the Court, without further notice, to adjourn the Auction; and (ii) withdraw the Real Estate from the Auction at any time prior to or during the Auction.

6. <u>Sale Hearing</u>. A hearing (the "Sale Hearing") will be conducted . . . July 9, 2008 . . . at which time the Debtor will present either: (i) the Stalking Horse Bid; (ii) the Final Successful Bid; or (iii) the highest of the Back-Up Bids, for approval by the Court of such Bid, and the assumption or rejection of any executory contracts or unexpired leases.

7. <u>Additional Deposit</u>. Within two business days following the conclusion of the Sale Hearing, the maker of the Final Successful Bid must provide an additional deposit of an amount equal to the difference between the Deposit and 25% of such Bid (the "Additional Deposit").

\*\*\*

10. <u>Resolution of Disputes</u>. If the Debtor and the Committee are unable to reach agreement among themselves as to any of the matters which are entrusted to their judgment or discretion, the Court shall retain jurisdiction to resolve any such dispute.

[DE 391, at Ex. 1].

Two days after entry of the Sale Order, the Debtor applied for authorization to hire Jim Gall and Auction Company of America as auctioneer, *see* [DE 396], which was granted May 22, 2008 (the "Auctioneer Order") [DE 406]. The Auctioneer Order provided in relevant part:

The retention of the Auctioneer is **APPROVED** with compensation to be calculated upon a 6% buyer's premium model, subject to other terms and conditions set forth in the Application, the listing agreement annexed to the Affidavit of Auctioneer...

*Id.* at ¶ 1. Incorporated into the Auctioneer Order was a listing agreement, which provided in pertinent part that "...Seller agrees to sell Property at Auction at a final bid amount of $13,300,000..." [DE 396, at Ex. C]. Ultimately, the deadline for submission of qualifying bids was

extended to July 17, 2008 at 1:00 p.m. *See* [DE 493].

On June 20, 2008, counsel for the Creditors' Committee sent an email to Harry Tangalakis[1] directing him to review the listing agreement to determine that the minimum bid on the property had to be at least "$13.3 million."[2]  On June 25, 2008, Tangalakis sent an email to Jim Gall[3] asking, "Jim, when people ask if there is a minimum I tell them $13.3. Should we tell them or just have them show up?  It sounds like they lose interest when I tell them the number."[4]  On June 26, 2008, Gall responded, "Harry, probably best to tell them like it is..."[5]

On July 13, 2009, Gall sent an email to Tangalakis, requesting a meeting "...with the attorneys ... so that we are totally prepared and all on the 'same page'...".[6]  No such meeting was held.  In fact, the first time that Gall met Debtor's counsel was on the day of the auction.

On July 16, 2008, counsel for Transworld Marine's counsel sent an email to Debtor's counsel and Creditors' Committee counsel indicating that Tangalakis informed Tansworld that the minimum bid would be $13.3 million plus the six percent (6%) buyer's premium (approx. $14.1 mm

---

[1] One of the persons associated with CB Richard Ellis, the "partner" of Auction Company of America in the assignment to auction the property.

[2] Email from Mindy Mora to Harry G. Tangalakis (June 20, 2008, 3:17pm) (on file with the Court in 02/10/09 1:30pm hearing exhibit binder, tab E, orange flag).

[3] Gall is president of Auction Company of America.

[4] Email from Harry G. Tangalakis to Jim Gall (June 25, 2008, 10:04am) (on file with the Court in 02/10/09 1:30pm hearing exhibit binder, tab E, yellow flag).

[5] Email from jgacoa@aol.com to harry.tangalakis@cbre.com (June 26, 2008, 7:14am) (on file with the Court in 02/10/09 1:30pm hearing exhibit binder, tab E, blue flag).

[6] Email from jgacoa@aol.com to harry.tangalakis@cbre.com (Jul 13, 2008, 11:55pm) (on file with the Court in 02/10/09 1:30pm hearing exhibit binder, tab E, flag *1).

total opening bid).[7]  The email stated, "We were under the impression there was no minimum bid

as we did not see any thing in the bid procedures setting one.  This new information changes the

direction we will probably take and we need to speak with our client to see what he wants to do, if

anything.  In any event, we apologize for wasting some our your time and we wish you good luck

in the sale."[8]

Tangalakis immediately responded, correcting the buyer's premium amount to five percent.[9]

Moments later, Transworld's counsel acknowledged the correction.[10]    Eleven minutes later,

Movant's counsel sent the following email to Tangalakis, "...is there a minimum bid or are you

saying we should simply not bid unless we are prepared to start above 13.3 (plus premium) because

there won't be a confirmed sale below that level to someone other than the lender?"[11]  Tangalakis

forwarded that email to Debtor's and Creditors' Committee counsel (with the subject line "Help")

and stated, "I do not want to misrepresent, can either of you assist me with a clarification on this

matter?"[12]   Finally, about a half-hour later, Transworld counsel sent the following email to

Tangalakis, Debtor's counsel, Creditors' Committee counsel, and others: "I reviewed the bid

procecures and court orders.  I do not see anything anywhere setting a minimum bid in order to be

---

[7] Email from Michael Goldberg to aspector@bergersingerman.com, mmora@akerman.com, Harry G. Tangalakis, and Phil Landau (Jul 16, 2008, 4:55pm) (on file with the Court in 02/10/09 1:30pm hearing exhibit binder, tab E, flag *2).

[8] *Id.*

[9] Email from Harry G. Tangalakis to Michael Goldberg, *et al.* (Jul 16, 2008, 16:59:56) (on file with the Court in 02/10/09 1:30pm hearing exhibit binder, tab E, flag *3).

[10] *Id.* at reply (5:01pm).

[11] Email from Michael Goldberg to Harry G. Tangalakis (Jul 16, 2008, 5:12pm) (on file with the Court in 02/10/09 1:30pm hearing exhibit binder, tab E, flag *4).

[12] *Id.* at 17:26:21 replying to Michael Goldberg and forwarding to mmora@bilzin.com, aspector@bergersingerman.com, jason.bodnick@gmail.com, jgacoa@aol.com.

a qualified bidder.  Accordingly, our bid will be under the $13.3 level.  Please let me know immediately if you disagree."[13]

The auction was conducted the following day, July 17, 2008.  On the back of every bidder's "paddle" (the card on which the bidder's number appears) there is the written statement, "If there is a reserve, then the Auctioneer reserves the right to bid on behalf of the Seller."[14]  Just before the auction began, a meeting was held (among counsel for the Debtor, the Creditors' Committee, and the auctioneer group) where it was revealed that no bidder had submitted a bid at or over the minimum.  The Debtor's and Creditors' Committee counsel decided *not* to cancel the auction. Then, minutes before the auction was supposed to begin, one Danny Botton arrived with a cashier's check for $250,000 (as required by the auction rules) and asked Gall for the right to participate in the auction.  Gall reviewed the PSA with Botton, explained the minimum bid, filled in the date, the name of the buyer, and the purchase price of $13,715,000 (which was the minimum bid plus the buyer's premium).  After explaining the PSA to Botton, Gall turned him over to Debtor's and Creditors' Committee counsel.  Botton was approved as a bidder by both groups, who informed Gall that Botton's PSA was qualified, notwithstanding its tardiness under the terms of the Sale Order.

Gall had no role in the qualification of Botton.  Creditors' Committee counsel called Botton's bank to ascertain his financial ability.

The auction began at 2:45 that afternoon. During the first four minutes, Gall made announcements, including detailed changes to the PSA as instructed by Debtor's counsel.[15]  A short

---

[13] Email from Michael Goldberg to Harry G. Tangalakis, *et al.* (Jul 16, 2008, 6:00pm) (on file with the Court in 02/10/09 1:30pm hearing exhibit binder, tab E, flag *5).

[14] Hearing Exhibit E.

[15] *See* Transworld Ex. 12, pages 3 - 5, line 15 and compare to Ex. 11 (the auction video).

8

conference then took place between Gall, Debtor's counsel, Creditors' Committee counsel, and other members of the sales team.[16]  After this conference, Gall continued with announcements, stated that, "In bankruptcy, it's always subject to the Judge's final approval," and commenced the bidding.[17]

Gall started the bidding at $10,000,000.[18]  According to his testimony, he was bidding on behalf of the seller due to the minimum bid requirement.  His ultimate bid on behalf of the seller was $13,000,000, and he sought a higher bid of $14,000,000 to no avail.  After less than a minute of "bidding," a conference was held between Debtor's, Creditors' Committee, and auction team counsel where Tangalakis indicated that "The bidder wants to know who the initial bidder was."[19]  Gall responded, "At this point we do not identify each and every bidder . . . we are short of the minimum requirement that the Court has given us.  If you want to increase the bid you're welcome to do that."[20]

At approximately six and a half minutes into the auction, objections were raised to the assertion that there was a minimum bid, the bidding increment, and the refusal to identify the initial bidder.[21]  After the objections, Debtor's counsel took the microphone and announced the Preliminary Successful Bid at $13,300,000, confirmed that the terms of that bid were consistent with the PSA, and inquired of counsel for the Creditors' Committee whether there were any changes to the PSA

---

[16] *See* auction video at Transworld Ex. 11 & Auction Ex. E.

[17] Transworld Ex. 12, at p. 6, lines 4 - 5 (commencing bidding at about 5 minutes, 13 seconds in).

[18] *Id.* at p. 6, line 9.

[19] *Id.* at p. 6, lines 16 - 17.

[20] *Id.* at p. 6, lines 18 - 23.

[21] *Id.* at p. 6, line 20 through p. 8, line 8.

that should be announced.[22]  Then Debtor's counsel announced that "We're starting over because we were supposed to announce the preliminary qualified or successful bid.  That number is thirteen-three," and Debtor's counsel then confirmed that the identity of the initial bidder would not be disclosed.[23]  Debtor's counsel then confirmed that "We've investigated and we're satisfied it's a qualified bidder."[24]

Gall then recommenced the bidding at $13,300,000, and drew out the bidding for over one and one-half minutes to permit counsel for the ultimate high bidder to consult with his client by phone.  Ultimately, the highest bid was $13,400,000 by Transworld.  Gall kept the bidding open for nearly another two minutes, finally accepting the Transworld's high bid of $13,400,000.  Gall's only remaining obligation at that point was to file a report of sale.

During the nearly four-hour evidentiary hearing on this matter, expert witness Joel Langbaum testified that Gall conducted the auction in a professional manner, consistent with accepted open outcry auction procedures and that he saw no failures on Gall's part.  Langbaum observed that the auctioneer's role is to get a buyer to bid, which Gall did.

Alex Nichols, the principal of the largest secured creditor (84 Marina, LLC) testified that he was satisfied with the manner in which Gall conducted the auction.  As a result of the ultimate failure of the auction, 84 Marina acquired the property by agreement.  Nichols testified that he subsequently discussed engaging Gall to sell the very same property for 84 Marina.

Apparently, the only persons now dissatisfied with the performance of the auctioneer are the

---

[22]  *Id.* at p. 8, line 22 through p. 9, line 7.

[23]  *Id.* at p. 9, line 14 through p. 10, line 6.

[24]  *Id.* at p. 10, lines 11 - 12 (approximately 10 minutes and 40 seconds into the auction).

successful bidder and the Trustee, who was appointed nearly three months after the auction. *See* [DE 596].

## Discussion

Transworld's allegations are quoted below and retain the paragraph numbering from [DE 561]. My findings regarding each allegation immediately follow each block quote.

### *First Allegation*

> 10. The Sale Order further provides, in relevant part, that "[b]idding shall commence at the amount and on the terms specified in the "Preliminary Successful Bid" (as defined in the Sale Order) for the Real Estate, which shall be announced by the Debtor at the commencement of the Auction. Bidders may submit successive bids in increments of $100,000 or greater than the prior bid for the purchase of the Real Estate...." Sale Order at p. 10.

Gall did not announce the Preliminary Successful Bid. No provision of the Sale Order (or any other order) required him to do so. The Sale Order required New River Boat Club, Inc. (the "Debtor") to make the announcement. While one might have assumed that the Debtor would have carried out its duties via the auctioneer, the auctioneer cannot be blamed for the failure of the Debtor to carry out its duties. Gall requested a meeting with the attorneys prior to the auction; none was held. Debtor's and Creditors' Committee counsel were standing in close proximity to Gall and consulted with him immediately before commencement of the auction. Gall made various announcements as instructed by the various counsel for the first four minutes of the auction.

Fewer than seven minutes into the auction, Debtor's counsel finally announced the Preliminary Successful Bid. The auction was "restarted," and bids in the correct increments were solicited from that point on.

11

*Second Allegation*

> 11.  The auction commenced at approximately 2:30 pm, and in
> violation of the specific terms of the Sale Order...  the Auctioneer
> knowingly and willfully refused to announce the Preliminary
> Successful Bid, but instead opened the bidding seeking a $15 million
> bid. See Transcript at pp.6-8. 2 After nobody bid $15 million, the
> Auctioneer next, in further violation of the Sale Order, dropped the
> opening bid to $10 million and stated, "Ten million is bid right here.
> Eleven, now twelve; twelve into thirteen. Thirteen million now
> fourteen?" Transcript, p. 6, lines 6-15.

Under the terms of the Sale Notice, approved through the Sale Order, "The Auction will be conducted in accordance with procedures that the Debtor and the Committee, after consultation and agreement, determine will achieve the maximum realizable value for the Real Estate. The procedures shall be announced at the commencement of the Auction. The Debtor, with the consent of the Committee, may terminate the Auction at any time and for any reason." [DE 391].  Further, the Debtor "shall have the right in its discretion, with the consent of the Committee, to: (i) request of the Court, without further notice, to adjourn the Auction; and (ii) withdraw the Real Estate from the Auction at any time prior to or during the Auction." *Id.*

Gall had no discretion in setting the Auction start time.  While neither the Sale Order nor the Sale Notice explicitly vest anyone with the right to change the time of the Auction, it is clear that the Debtor had the right to change auction procedures and/or terminate the Auction without Court approval.  Gall merely followed instructions to delay the commencement of the Auction until he was instructed to begin.

*Third Allegation*

> 12.  The Auctioneer's statements made it appear that people were
> bidding. However, Transworld's attorney did not see anyone bidding.
> Needless to say, Transworld's attorney was completely confused and
> was unsure if in fact bidding was taking place.  Accordingly,

12

Transworld's attorney requested the Auctioneer to identify who in fact was bidding. The Auctioneer specifically refused to identify the bidder, and moreover, stated that "at this point we are short of the minimum requirement that the Court has given us." Transcript at p. 6, lines 18-23. In response thereto, Transworld's counsel placed an objection on the record to the way the auction was being conducted specifically stating that the Court did not set a minimum bid and that bidding increments were supposed to be in $100,000 increments, starting from the opening highest bid. Transcript, at p 6 line 24- 25, p. 7, lines 1-5. Curiously, in response to Transworld's counsel's objection, the Auctioneer inquired of Transworld's counsel whether Transworld would like to bid $13.1 million. Transworld's counsel declined.

13. The Auctioneer continued the auction stating "Thirteen into thirteen-one?", leading Transworld to believe that there was a legitimate bid at $13 million. However, Transworld's counsel could not tell if there was a legitimate bid at $13 million, because once again he did not see anyone bid. Accordingly, Transworld's counsel once more inquired if there was a legitimate bid at $13 million. The Auctioneer did not respond, but continued to seek a $13.1 million bid. Transcript p 7, lines 8-19. In response to being ignored, Transworld's counsel placed another objection on the record stating that he could not tell if there was a legitimate bid at $13 million or if the "auctioneer is making it up." Transcript p. 7, lines 20-25. A similar objection was also placed on the record at this time by Secured Creditor, 84 Marina, LLC's counsel.

14. In response to these objections, Debtor's counsel rightfully intervened and halted the auction in an effort to resolve the confusion. After an approximate ten minute break, Debtor's counsel stated that Transworld's and 84 Marina, LLC's objections were "duly noted" and the auction would recommence and that the "Preliminary Successful Bid" was $13.3 million, $200,000 higher than the amount offered to Transworld just ten minutes earlier. Transworld's and 84 Marina LLC's counsel asked for the identity of the preliminary successful bidder, however, Debtor's counsel refused to disclose the successful preliminary bidder's identity.

Procedural deficiencies of the early moments of the auction were largely, if not wholly, cured

by "restarting" the auction, at which time (1) the Debtor complied with its obligation to announce

the Preliminary Successful Bid, (2) the Debtor's counsel confirmed that the identity of the bidder

would not be disclosed, and (3) the bidding increment of $100,000 was honored.  Gall's errors in the first few minutes were thus immaterial - and are more fairly attributed to the fact that Gall's request for a pre-auction meeting with Debtor's and Creditors' Committee counsel did not occur.

*Remaining Allegations*

The remaining allegations of misconduct in the Motion are directed toward the alleged fraud in introducing an alleged "shill" into the auction process.  I reserve this topic for future consideration in the event that an appropriate motion is filed by a party in interest.  To the extent that Bodden was a shill, he wasn't Gall's shill.  To the extent that Gall found bids from the ether,[25] the terms of an open outcry auction permit the auctioneer to bid in amounts below the reserve price on behalf of the seller.  Actions by an auctioneer to encourage a bidding frenzy are fully consistent with the interests of a bankruptcy estate attempting to sell property.  No one was defrauded as a result of Gall's conduct, which I find to have been appropriate in the circumstances.

## Conclusion

Transworld seeks sanctions against the auctioneer for its pre-auction "due diligence" fees and costs, plus the fees and costs related to prosecuting its motion,[26] citing *In re Sunshine Jr. Stores, Inc.*, 456 F.3d 1291, 1304 (11th Cir. 2006). The Eleventh Circuit stated in that case that, "[t]he key to unlocking a court's inherent power is a finding of bad faith . . . A party . . . demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order." *Id.* at 1304

---

[25] Auctioneers at indoor auctions frequently find bids coming from the chandelier; since this auction occurred on a boat dock, no chandeliers were present.

[26] Movant also seeks punitive sanctions, citing *In re Poole*, 242 B.R. 104, 111 (Bankr. N.D. Ga. 1999) and *Glatter v. Mroz*, 65 F.3d 1567 (11th Cir. 1995).  Since the Court concludes that Gall and Auction Company of America violated no affirmative duties or orders and are not in contempt, no discussion of punitive sanctions is necessary or appropriate.

(citations and quotation marks omitted).  The Court cautioned, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." Id. at 1305 (citations omitted).

"A party seeking civil contempt bears the initial burden of proving by clear and convincing evidence that the alleged contemnor has violated an outstanding court order." *Commodity Futures Trading Com. v. Wellington Precious Metals, Inc.*, 950 F.2d 1525, 1529 (11th Cir. 1992). Transworld has not met its burden and the Motion must therefore be denied.

While it is certainly the case that Gall did not announce the Preliminary Successful Bid and did not initially seek bids in increments of $100,000,[27] I conclude that Transworld was not damaged as a result of Gall's conduct.  The integrity of the bankruptcy system and of bankruptcy sales has not been threatened or compromised.  Debtor's counsel appropriately intervened to re-start the auction and in doing so announced the Preliminary Successful Bid.  After the "re-start," Gall sought the next bid in the correct increment.

Delay of the Auction's start time and the approval of the Preliminary Successful Bid were not matters within Gall's discretion or control.  Gall cannot therefore be properly charged with wrongful conduct for deviations from the Sale Order or the Sale Notice.

It is therefore **ORDERED**:

1.    Transworld Marine Co.'s Motion for Sanctions Against Auctioneer and/or Real Estate Agent in Connection with Conduct at Auction [DE 561], joined in by the Trustee [DE 623], as limited by this Court's Order Specially Setting Bifurcated Evidentiary Hearing [DE 625] is **DENIED**.

2.    A status conference on the remaining issues raised in the Motion or the Trustee's

---

[27] I am not suggesting that such failure was partially or entirely Gall's fault.

15

joiner (as provided in the Order Specially Setting Bifurcated Evidentiary Hearing

[DE 625]) will only be scheduled upon written request of a party in interest.

### 

Copies to:

Arthur J. Spector, Esq
350 E Las Olas Blvd #1000
Ft. Lauderdale, FL 33301
(954) 525-9900
Fax : (954) 523-2872
Email: aspector@bergersingerman.com

James H. Fierberg, Esq
200 S Biscayne Blvd #1000
Miami, FL 33131
(305) 755-9500
Fax : (305) 714-4340

David Brett Marks, Esq
201 S Biscayne Blvd #1700
Miami, FL 33024
(305) 379-9000

Mr. Marks is directed to provide copies of
this Order to interested parties not properly
listed.

Heidi A Feinman
Office of the US Trustee
51 SW 1 Ave #1204
Miami, FL 33130
(305) 536-7285
Fax : (305) 536-7360
Email: Heidi.A.Feinman@usdoj.gov

Mindy A. Mora, Esq
200 S. Biscayne Blvd #2500
Miami, Fl 33131
(305) 350-2414
Fax : (305) 351-2242
Email: mmora@bilzin.com